Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHAD LERNER, derivatively on behalf of GERON CORPORATION, | |
| Plaintiff, | Case No.: |
| v. | |
| JOHN A. SCARLETT, ANDREW J. GRETHLEIN, MICHELLE J. ROBERTSON, FAYE FELLER, ANIL KAPUR, JIM ZIEGLER, GAURAV AGGARWAL, DAWN C. BIR, V. BRYAN LAWLIS, JOHN F. MCDONALD, SUSAN M. MOLINEAUX, ELIZABETH G. O'FARRELL, and ROBERT SPIEGEL, | **DEMAND FOR JURY TRIAL** |
| Defendants, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| and | |
| GERON CORPORATION, | |
| Nominal Defendant. | |

**INTRODUCTION**

Plaintiff Chad Lerner ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Geron Corporation ("Geron" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants John A. Scarlett ("Scarlett"), Andrew J. Grethlein ("Grethlein"), Michelle J. Robertson ("Robertson"), Faye Feller ("Feller"), Anil Kapur ("Kapur"), Jim Ziegler ("Ziegler"), Gaurav Aggarwal ("Aggarwal"), Dawn C. Bir ("Bir"), V. Bryan Lawlis ("Lawlis"), John F. McDonald ("McDonald"), Susan M. Molineaux ("Molineaux"), Elizabeth G. O'Farrell ("O'Farrell"), and Robert Spiegel ("Spiegel") (collectively, the "Individual Defendants," and together with Geron, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Geron, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Scarlett, Grethlein, Robertson, Feller, Kapur, and Ziegler for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Geron, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from February 28, 2024 through February 25, 2025, inclusive (the "Relevant Period").

2.      Geron is a commercial biopharmaceutical company focusing on the area of blood cancer treatment. Geron's principal product is currently RYTELO (imetelstat), a telomerase inhibitor that purports to reduce the growth of malignant cells and improve the production of healthy cells. RYTELO launched commercially in the U.S. in June 2024. Additionally, Geron is developing further forms of imetelstat for the treatment of other related blood conditions.

3.      During the Relevant Period, the Individual Defendants issued or caused the Company to issue false and misleading statements that made it appear to investors that the launch of RYTELO would prove more successful than it actually was. This, however, was far from the truth, as RYTELO's launch was impacted by, *inter alia*, the weekly monitoring requirement, existing competition and seasonality, and a general lack of awareness in the health care industry of the treatment.

4.      Despite this, the Individual Defendants continued to spread misinformation about the Company's product. For example, on May 2, 2024, the Company hosted an earnings call regarding the Company's financial results for the first quarter of 2024 (the "Q1 2024 Earnings Call"). During the call, Defendant Kapur stated that the Company was "*. . . well-positioned to capitalize on Imetelstat opportunity in transfusion-dependent low-risk MDS by building on the unique product profile and executing on the launch critical success factors that are driving [the Company's] commercial plan*."[1]

5.      In addition, on June 7, 2024, Geron hosted a special investor call to discuss RYTELO's FDA approval. During the call, Defendant Feller stated that the weekly monitoring requirement for the treatment was not considered a burden by either the medical community or academic medical centers.

---

[1] All emphasis has been added unless otherwise noted herein.

6.     The truth did not emerge until February 26, 2024, when Geron announced its financial results for the fourth quarter and full year of 2024. The Company observed revenue of $47.54 million and an earnings per share of -$.004, notably lower than $61.93 million in revenue and earnings per share of -$.002 to -$.003 predicted. Also on February 26, 2024, the Company hosted an earnings call in which Defendant Scarlett noted the stagnant revenue trends and cited the following reasons: the weekly monitoring requirement, existing competition and seasonality, and a general lack of awareness in the health care industry of the treatment. That same day, the investment bank H.C. Wainwright & Co revised its assessment of the Company's stock from buy to neutral. Barclays likewise reduced the Company stock price target by 56%.

7.     On this news, the price of the Company's stock fell $0.76 per share, or approximately 32.06%, from a closing price of $2.37 per share on February 25, 2025 to close at $1.61 per share on February 26, 2025.

8.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the launch of RYTELO would be hindered by the weekly monitoring requirement, existing competition and seasonality, and a general lack of awareness in the health care industry of the treatment; (2) as a result of this, the launch of RYTELO would be less profitable than advertised; and (3) as a result of the foregoing, the Company would experience less growth than was advertised. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

9.     Moreover, three of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock was artificially inflated

as a result of the Individual Defendants' false and misleading statements discussed herein, reaping combined personal proceeds of approximately $6,366,740.

10.     In light of the Individual Defendants' misconduct—which has subjected the Company, its former Chief Executive Officer ("CEO"),  its Executive Vice President ("EVP") and Chief Operating Officer ("COO"), its EVP and Chief Financial Officer ("CFO"), its EVP and Chief Medical Officer ("CMO"), its former EVP  of Corp Strategy and Chief Commercial Officer ("CCO"), and its EVP of Corp Strategy and CCO to two federal securities fraud class action lawsuits pending in the United States District Court for the Northern District of California (the "Securities Class Actions"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

11.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

12.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Scarlett's, Defendant Grethlein's, Defendant Robertson's, Defendant Feller's, Defendant Kapur's, and Defendant Ziegler's liability in the Securities Class Actions, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C.  § 1331

because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

17.     Plaintiff is a current shareholder of Geron. Plaintiff has continuously held Geron common stock at all relevant times.

### Nominal Defendant Geron

18.     Geron is a Delaware corporation with principal executive offices at 919 E. Hillsdale Blvd., Suite 250, Foster City, California 94404. Geron's common stock trades on the Nasdaq Stock Market LLC ("NASDAQ") under the ticker symbol "GERN."

### Defendant Scarlett

19.     Defendant Scarlett served as a director and CEO from September 2011 until March 2025, and as president from January 2012 until March 2025. He has also served as the chairman of the Company's Board from December 2018 until March 2025.

20.     The Schedule 14A the Company filed with the SEC on March 27, 2024 (the "2024 Proxy Statement") stated the following about Defendant Scarlett:

John A. Scarlett, M.D. has served as our Chief Executive Officer and a director since September 2011 and President since January 2012 and was appointed as Chairman of the Board in December 2018. Dr. Scarlett served as a director of CytomX Therapeutics, Inc., a biopharmaceutical company focused on developing antibody therapeutics for the treatment of cancer, from June 2016 to June 2022. He was also a director for Chiasma, Inc., a biopharmaceutical company focused on transforming injectable drugs into oral medications, from February 2015 until its acquisition by Amyrt Pharma plc, a biopharmaceutical company, in August 2021. Prior to joining Geron, Dr. Scarlett served as President, Chief Executive Officer and a member of the board of directors of Proteolix, Inc., a privately held, oncology-oriented biopharmaceutical company, from February 2009 until its acquisition by Onyx Pharmaceuticals, Inc., an oncology-oriented biopharmaceutical company, in November 2009. From February 2002 until its acquisition by Ipsen, S.A. in October 2008, Dr. Scarlett served as the Chief Executive Officer and a member of the board of directors of Tercica, Inc., an endocrinology-oriented biopharmaceutical company, and also as its President from February 2002 through February 2007. From March 1993 to May 2001, Dr. Scarlett served as President and Chief Executive Officer of Sensus Drug Development Corporation. In 1995, he co-founded Covance Biotechnology Services, Inc., a contract biopharmaceutical manufacturing operation, and served as a member of its board of directors from inception to 2000. From 1991 to 1993, Dr. Scarlett headed the North American Clinical Development Center and served as Senior Vice President of Medical and Scientific Affairs at Novo Nordisk Pharmaceuticals, Inc., a wholly owned subsidiary of Novo Nordisk A/S. Dr. Scarlett received his B.A. degree in chemistry from Earlham College and his M.D. from the University of Chicago, Pritzker School of Medicine.

**Defendant Grethlein**

21.    Defendant Grethlein has served as the Company's EVP and COO since January 2019.

22.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Grethlein made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| July 8, 2024 | 674, 348 | $4.56 | $3,073,003 |

Thus, in total, before the fraud was exposed, Defendant Grethlein sold 674,348 shares of Company stock on inside information, for which he received approximately $3.07 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

23.    The Geron corporate website[2] stated the following about Defendant Grethlein:

Previously, he served as our Executive Vice President, Development and Technical Operations, from July 2014 to January 2019. He joined Geron in September 2012 as our Executive Vice President, Technical Operations. Prior to joining Geron, Dr. Grethlein was Executive Vice President and Chief Operating Officer for Inspiration Biopharmaceuticals, a biopharmaceutical company, from January 2010 to September 2012. From October 2008 until January 2010, Dr. Grethlein was Senior Vice President of Biotechnology and Portfolio Management Team Leader for Hematology at Ipsen S.A., a global specialty pharmaceutical company. His responsibilities at Ipsen included planning and execution of worldwide strategy for product and portfolio development in the hematologic therapeutic area. From 2003 to 2008, Dr. Grethlein served as Senior Vice President of Pharmaceutical Operations at Tercica, Inc., an endocrinology-oriented biopharmaceutical company, where he was a member of the senior executive team that governed corporate strategy, business planning and company operations, and had responsibility for all manufacturing and quality functions.

**Defendant Robertson**

24.    Defendant Robertson has served as the Company's EVP and CFO since September 2023. Defendant Robertson is also a director of the Board for Verastem, Inc., another biopharmaceutical company.

25.    The Geron corporate website[3] stated the following about Defendant Robertson:

---

[2] *Andrew J. Grethlein, Ph.D. Executive Vice President, Chief Operating Officer,* GERON, https://www.geron.com/leadership/andrew-grethlein/ (last visited Apr. 3, 2025).
[3] *Michelle Robertson, Executive Vice President, Chief Financial Officer and Treasurer*, GERON, https://www.geron.com/leadership/michelle-robertson/ (last visited Apr. 3, 2025).

Prior to joining Geron, Ms. Robertson served as the Chief Financial Officer and Treasurer of Editas Medicine, Inc., a CRISPR genome editing company, from January 2020 to May 2023. Before that, she served as Chief Financial Officer of Momenta Pharmaceuticals, Inc., from 2018 until 2020, when Momenta was acquired by Johnson & Johnson. Prior to joining Momenta, Ms. Robertson held multiple commercial finance roles of increasing responsibility, including Vice President, Oncology Finance, for Baxalta Inc., following its spin-off from Baxter International Inc., from 2015 to 2016, Head of Financial Planning and Analysis and Operations Excellence at Ironwood Pharmaceuticals, Inc., from 2012 to 2015, and various finance and commercial operations roles at Genzyme Corporation (acquired by Sanofi).

**Defendant Feller**

26.    Defendant Feller has served as an EVP and CMO since July 2022.

27.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Feller made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| June 10, 2024 | 287,900 | $4.63 | $1,334,128 |

Thus, in total, before the fraud was exposed, Defendant Feller sold 287,900 shares of Company stock on inside information, for which she received approximately $1.33 million in total proceeds. Her insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the scheme.

28.    The Geron corporate website[4] stated the following about Defendant Feller:

Previously, she served as our Vice President of Clinical Development since she joined Geron in April 2019. In this role, Dr. Feller played a strategic role in designing and driving execution of Geron's Phase 3 clinical trials, served as the primary medical point of contact between Geron and our clinical investigators and led the preparation of data for assessment by the data

---

[4] *Faye Feller, M.D. Executive Vice President, Chief Medical Officer,* GERON, https://www.geron.com/leadership/faye-feller/ (last visited Apr. 4, 2025).

monitoring committees. Prior to joining Geron, Dr. Feller was Senior Director at Janssen Research and Development, LLC (Janssen), a global pharmaceutical company, and both a Compound Lead and Study Responsible Physician for multiple clinical trials of early and late-stage development assets at Janssen from February 2015 to March 2019. Prior to Janssen, Dr. Feller was an instructor in the leukemia department of Memorial Sloan Kettering Cancer Center in New York from July 2013 to February 2015. She received a B.A. from New York University and an M.D. from Mount Sinai School of Medicine. She completed her residency in internal medicine at Mount Sinai Hospital and her fellowship in medical oncology at Memorial Sloan Kettering Cancer Center.

**Defendant Kapur**

29.    Defendant Kapur served as an EVP of corporation strategy and CCO from December 2019 to August 2024. He is currently a director on the Board of Verastem Oncology and Nurix Therapeutics.

30.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Kapur made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|------|------------------|----------------------|--------------|
| June 10, 2024 | 421,875 | $4.64 | $1,959,609 |

Thus, in total, before the fraud was exposed, Defendant Kapur sold 421,875 shares of Company stock on inside information, for which he received approximately $1.95 million in total proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

31.    The Verastem Oncology corporate website[5] stated the following about Defendant Kapur:

---

[5] Anil Kapur, Verastem Oncology, https://investor.verastem.com/anil-kapur (last visited Apr. 4, 2025).

Mr. Kapur is a deeply experienced executive with over 25 years of experience in pharmaceutical and biotech companies across U.S. and international markets. He has held senior leadership positions where he has been responsible for launching significant global brands, building and managing commercial capabilities in small and large organizations, driving corporate strategy, and managing alliances. Mr. Kapur is currently a member of the Board of Directors for Nurix Therapeutics. Most recently, he served as the Executive Vice President, Corporate Strategy and Chief Commercial Officer at Geron Corporation. Before Geron, Mr. Kapur served as the Chief Commercial Officer at Actinium Pharmaceuticals, Inc. and as the Vice President, Head of Early Assets, Biomarkers and External Innovation for Worldwide Oncology Commercialization at Bristol-Myers Squibb. Previously, Mr. Kapur was Vice President, Global Head of Commercial and Portfolio Strategy at Baxalta, Inc., which was acquired by Shire PLC in 2016. Before joining Baxalta, Mr. Kapur served as the Vice President, Commercial Leader Hematology Franchise at Johnson & Johnson's global pharmaceutical strategy organization and in various sales and marketing leadership roles. Mr. Kapur holds a BE from Birla Institute of Technology in India, an MS in Industrial Engineering from Louisiana Tech University, and an MBA from the Fuqua School of Business at Duke University.

**Defendant Ziegler**

32.     Defendant Ziegler has served as an EVP and CCO since September 2024.

33.     The Geron corporate website[6] stated the following about Defendant Ziegler:

Prior to joining Geron, Mr. Ziegler served as the Executive Vice President, Commercial for Iovance Biotherapeutics, Inc., with global responsibilities for the company's novel autologous cell therapy program and led a successful U.S. commercial launch of Amtagvi™ for patients with previously treated advanced melanoma. He has more than 25 years of experience in the biopharmaceutical industry, including leading and supporting more than 10 product launches. Previously, he served in numerous commercial roles at Gilead Sciences, Inc., most recently as Vice President of the Cardiopulmonary and Inflammation Business Unit. He also led the U.S. launch team for Gilead's first approved oncology product and supported the launch of several multibillion-dollar antiviral products for the human immunodeficiency virus (HIV) and hepatitis (HCV and HBV) franchises. His earlier experience included commercial roles of increasing responsibility at Biogen, Amgen and

---

[6] *Jim Ziegler Executive Vice President, Chief Commercial Officer,* GERON https://www.geron.com/leadership/jim-ziegler/ (last visited Apr. 16, 2025).

Verified Shareholder Derivative Complaint

Pfizer. Prior to the biopharmaceutical industry, he served as an Armor Officer in the U.S. Army. Mr. Ziegler received a B.S. from the United States Military Academy at West Point and an M.B.A. from the University of Chicago.

**Defendant Aggarwal**

34.    Defendant Aggarwal has served as a Company director since November 2023. He also serves as a member of the Compensation Committee and as chairperson of Strategic Committee.

35.    The 2024 Proxy Statement stated the following about Defendant Aggarwal:

Gaurav Aggarwal, M.D. has served as a director of Geron since November 2023. Dr. Aggarwal has been an investor in the life sciences sector for more than 20 years. Most recently he was Managing Director of global investment firm, Vivo Capital LLC, from 2016 to 2023 and Chief Investment Officer of its U.S. public investment fund from 2021 to 2023. Dr. Aggarwal previously served as the Chief Business Officer of Ocera Therapeutics, Inc., a publicly traded clinical stage company developing therapies for orphan liver conditions, from April 2014 through October 2016; as Managing Director of Investor Growth Capital from January 2013 through December 2013; and as a General Partner at Panorama Capital, L.P., a venture capital fund, from August 2006 through December 2012. Earlier in his career, Dr. Aggarwal was an associate with JPMorgan Partners, LLC, a private equity division of JPMorgan Chase & Co. Dr. Aggarwal has served on the board of Unicycive Therapeutics, Inc. since March 2023, and previously served on the Boards of Directors of Sierra Oncology, Inc. (acquired by GlaxoSmithKline plc), Hyperion Therapeutics, Inc. (acquired by Horizon Pharma plc), and on several privately held biopharmaceutical companies. Dr. Aggarwal received his B.S. in Agricultural Economics from Cornell University and his M.D. from Columbia University, College of Physicians & Surgeons.

**Defendant Bir**

36.    Defendant Bir has served as a Company director since March 2019. As of March 10, 2025, she currently serves as the Company's interim President and interim CEO, replacing Defendant Scarlett. Also as of March 10, 2025, Defendant Bir has stepped down from the Compensation Committee and the Corporate Governance Committee of the Board.

37.    The 2024 Proxy Statement stated the following about Defendant Bir:

Dawn C. Bir has served as a director of Geron since March 2019. Ms. Bir
served as the Chief Commercial Officer of Reata Pharmaceuticals, Inc., a
biopharmaceutical company where she led marketing, market access, sales,
and commercial operations, from September 2016 until Reata's acquisition by
Biogen, Inc. in September 2023. From February 2013 to September 2016, Ms.
Bir served as Vice President of Sales with Pharmacyclics LLC, an AbbVie
company, where she built and led their first hematology national sales
organization, and was responsible for the launch of IMBRUVICA in the
United States and Puerto Rico. From October 2011 to February 2013, Ms. Bir
served as Vice President of Sales & Marketing of SKY Pharmaceuticals
Packaging, Inc. & Rx Pak, a unit within the U.S. pharmaceutical and specialty
solutions division of McKesson Corporation, a global healthcare company,
where she was responsible for two companies and revenue centers, and led
multiple functions, including sales, marketing, contract management, project
management and customer service. From 1996 to October 2011, Ms. Bir held
several commercial and sales positions of increasing responsibility within
Genentech, Inc., a member of the Roche Group, a global pharmaceutical
company, and Bristol Myers Squibb Company, a global pharmaceutical
company. Ms. Bir holds a B.S. in Biology from Binghamton University.

**Defendant Lawlis**

38.    Defendant Lawlis has served as a Company director since March 2012, and
also serves as a member of the Audit Committee and the Nominating and Corporate
Governance Committee. Additionally, he currently serves as a member of the Board of
Directors of BioMarin Pharmaceutical, Inc.

39.    The 2024 Proxy Statement stated the following about Defendant Lawlis:

V. Bryan Lawlis, Ph.D. has served as a director of Geron since March 2012.
He also serves as a member of the board of directors of BioMarin
Pharmaceutical, Inc., a biopharmaceutical company specializing in rare
genetic diseases, since June 2007. In addition, he has served as an advisor to
Convergent Ventures (formerly Phoenix Venture Partners), a venture capital
firm, since October 2015. Dr. Lawlis previously served as a director of Sutro
Biopharma, Inc., a biologics platform company specializing in therapeutics
for cancer and autoimmune disorders, from January 2004 to June 2019;
Coherus BioSciences, Inc., a biologics platform company specializing in
biosimilars, from May 2014 to May 2021; and Aeglea BioTherapeutics, Inc.,

a biotechnology company specializing in human enzyme therapeutics for rare genetic diseases and cancer, from July 2018 to June 2022. Dr. Lawlis was the President and Chief Executive Officer of Itero Biopharmaceuticals LLC, a privately-held, early stage biopharmaceutical company that he co-founded, from 2006 to 2011. Dr. Lawlis also held several senior management positions in the biopharmaceutical industry, including President and Chief Executive Officer of Aradigm Corporation, a specialty drug company focused on drug delivery technologies, and President and Chief Executive Officer of Covance Biotechnology Services, a contract biopharmaceutical manufacturing operation, which he co-founded. Dr. Lawlis holds a B.A. in microbiology from the University of Texas at Austin and a Ph.D. in biochemistry from Washington State University.

**Defendant McDonald**

40.     Defendant McDonald has served as a Company director since September 2022. He also serves as a member of Audit Committee and a member of Strategic Committee.

41.     The 2024 Proxy Statement stated the following about Defendant McDonald:

John F. McDonald has served as a director of Geron since September 2022. Since October 2018, Mr. McDonald has served as Corporate Vice President, Global Head of Business Development and Mergers and Acquisitions, for Novo Nordisk A/S, a global pharmaceutical company, where he leads business development and merger and acquisition activities, investment strategies and participates in the creation of research, early development, and therapeutic pipeline diversification and augmentation strategies. From 2011 to 2018, Mr. McDonald was Vice President, Business Development, at Biogen Inc., a biopharmaceutical company, where he led business development and negotiated numerous strategic alliances, licenses and acquisitions. From 2006 to 2011, Mr. McDonald served as Managing Director at MPM Capital LP, an investment firm, where he served as the primary business development and asset strategy resource for multiple portfolio companies. Prior to 2006, Mr. McDonald held business development, corporate strategy, and legal roles of increasing responsibility at various biopharmaceutical companies, including at Millennium Pharmaceuticals Inc., a biotechnology company (now a Takeda Oncology Company, a pharmaceutical company), Genzyme Corp., a biopharmaceutical company (now part of Sanofi, a pharmaceutical company) and Genentech, Inc., a biopharmaceutical company (now a member of the Roche Group, a

pharmaceutical company). In those roles, Mr. McDonald developed relationships with numerous academic institutions, as well as biotechnology and pharmaceutical companies of all stages. Mr. McDonald holds a J.D. from the University of California College of the Law, San Francisco and an M.B.A. and B.S. from the Haas School of Business, University of California, Berkeley.

**Defendant Molineaux**

42.    Defendant Molineaux has served as a Company director since September 2012, and also serves as the chairwomen of the Nominating and Corporate Governance Committee.

43.    The 2024 Proxy Statement stated the following about Defendant Molineaux:

Susan M. Molineaux, Ph.D. has served as a director of Geron since September 2012. Dr. Molineaux has been the Chief Executive Officer at Para Therapeutics, Inc. since April 2023. Previously, she was Chief Executive Officer, President, and a member of the board of directors of Calithera Biosciences, Inc., since co-founding the company in June 2010 until March 2023. In January 2023, Calithera announced its intention to commence an orderly wind down of the company's business and operations and ceased operations in 2023 after its board of directors approved a plan of complete liquidation and dissolution. Dr. Molineaux served as a member of the boards of directors of Cyteir Therapeutics, Inc., a clinical-stage DNA repair and synthetic lethality company, from December 2020 until May 2023, and Theravance Biopharma, Inc., a biopharmaceutical company, from April 2015 to April 2022. She has also been a Scientific Advisor to Lightstone Ventures, a private life sciences investment company, since September 2016. Dr. Molineaux co-founded Proteolix, Inc., a privately-held oncology-oriented biopharmaceutical company, where she served as Chief Scientific Officer from December 2003 until December 2005 and from February 2009 until November 2009, and as President and Chief Executive Officer from January 2006 until February 2009, until the company's acquisition by Onyx Pharmaceuticals, Inc., a global oncology-oriented biopharmaceutical company, in November 2009. Previously, Dr. Molineaux held several senior management positions in the biopharmaceutical industry, including Vice President of Biology at Rigel Pharmaceuticals, Inc., a biopharmaceutical company focused on inflammatory and autoimmune diseases; Vice President of Biology at Praelux, Inc., a biopharmaceutical company; and Vice President of Drug Development at Praecis Pharmaceuticals, Inc., an oncology-focused

biopharmaceutical company. Dr. Molineaux holds a B.S. in biology from Smith College, a Ph.D. in molecular biology from Johns Hopkins University, and completed a postdoctoral fellowship at Columbia University.

**Defendant O'Farrell**

44.    Defendant O'Farrell has served as a Company director since March 2019, and currently serves as the lead independent director of the Board. She also serves as a member of the Strategic Committee, and as chairwomen and financial expert of the Audit Committee. As of March 10, 2025, Defendant O'Farrell has been appointed chairperson of the Board, replacing Defendant Scarlett.

45.    The 2024 Proxy Statement stated the following about Defendant O'Farrell:

Elizabeth G. O'Farrell has served as a director of Geron since March 2019. Ms. O'Farrell also serves as a member of the boards of directors of LENSAR, Inc., a global medical technology company, since February 2021; and Genmab A/S, a global oncology company, since March 2022. She served as a member of the board of directors of Inhibikase Therapeutics, a pharmaceutical company focused on treatments of neurological infections and neurodegenerative diseases, from March 2019 to September 2022. Ms. O'Farrell also served as a board member of the YMCA of Greater Indianapolis from 2006 until 2017, including as its chairperson from 2014 to 2016. In December 2017, Ms. O'Farrell retired from a 24-year career with Eli Lilly and Company, a global pharmaceutical company, where she held several senior management positions in finance and corporate governance, most recently serving as Chief Procurement Officer and Head of Global Shared Services from January 2012 to December 2017. Prior to that position, she also served as Senior Vice President, Policy and Finance; Senior Vice President, Finance; Chief Financial Officer, Lilly USA; Chief Financial Officer, Lilly Canada; and General Auditor. Before joining Eli Lilly, Ms. O'Farrell was an accountant with Boise Cascade Office Products, and served as an auditor at Whipple & Company, a professional accountancy firm, and Price Waterhouse, an international public accounting firm. Ms. O'Farrell holds a B.S. in accounting with honors and an M.B.A. in management information systems, both from Indiana University.

**Defendant Spiegel**

46.     Defendant Spiegel has served as a Company director since May 2010. He is also currently the chairman of the Compensation Committee.

47.     The 2024 Proxy Statement stated the following about Defendant Spiegel:

Robert J. Spiegel, M.D., FACP has served as a director of Geron since May 2010. Dr. Spiegel currently serves as an Associate Professor at the Weill Cornell Medical School, a Senior Advisor to Warburg Pincus, a private equity firm; and an Advisor to the Israel Biotech Fund, a venture investment fund. He is also a member of the boards of directors of Cyclacel Pharmaceuticals, Inc., a biopharmaceutical company developing targeted medicines for cancer and other proliferative diseases, since September 2018; Ayala Pharmaceuticals, a clinical-stage oncology company, since December 2017; and RenovoRx, a clinical-stage oncology company, since April 2023. In the last five years, he has previously served as a director for PDS Biotechnology Corporation (formerly Edge Therapeutics, Inc.), a biotechnology company, from August 2013 to March 2019, and Athenex, a biopharmaceutical company, from August 2020 to September 2023. From March 2011 to April 2016, Dr. Spiegel served as Chief Medical Officer of PTC Therapeutics, Inc., a biopharmaceutical company focused on discovering and developing treatments for rare disorders. In 2009, after 26 years with the Schering-Plough Corporation (now Merck & Co.), a global healthcare company, Dr. Spiegel retired as Chief Medical Officer and Senior Vice President of the Schering-Plough Research Institute, the pharmaceutical research arm of the Schering-Plough Corporation. His career at Schering-Plough involved various positions, including Director of clinical research for oncology, Vice President of clinical research, and Senior Vice President of worldwide clinical research. Following a residency in internal medicine, Dr. Spiegel completed a fellowship in medical oncology at the National Cancer Institute, and from 1981 to 1999 he held academic positions at the National Cancer Institute and New York University Cancer Center. Dr. Spiegel holds a B.A. from Yale University and an M.D. from the University of Pennsylvania.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

48.     By reason of their positions as officers, directors, and/or fiduciaries of Geron and because of their ability to control the business and corporate affairs of Geron, the Individual Defendants owed Geron and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to

control and manage Geron in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Geron and its shareholders so as to benefit all shareholders equally.

49.     Each director and officer of the Company owes to Geron and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

50.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Geron, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

51.     To discharge their duties, the officers and directors of Geron were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

52.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Geron, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

53.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded

on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

54.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Geron were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Geron's corporate governance and applicable codes of conduct and/or ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Geron conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Geron and procedures for the reporting of the business

and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

      (e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Geron's operations would comply with all applicable laws and Geron's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

      (f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

      (g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

      (h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

55.    Each of the Individual Defendants further owed to Geron and the shareholders the duty of loyalty requiring that each favor Geron's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

56.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Geron and were at all times acting within the course and scope of such agency.

57.    Because of their advisory, executive, managerial, and directorial positions with Geron, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

58.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts

complained of herein, as well as the contents of the various public statements issued by Geron.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

59.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

60.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

61.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Geron was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

62.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist

the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

63.     At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Geron and was at all times acting within the course and scope of such agency.

## GERON'S CODE OF CONDUCT

64.     Geron's Code of Business Conduct and Ethics (the "Code of Conduct") represents that the Company "is committed to maintaining high standards of legal and ethical business conduct." The Code of Conduct goes on to state that it "reflects the business practices and principles of behavior that support this commitment" and further that the Company "expect[s] every employee, officer, and director to read and understand the Code and its application to the performance of his/her/their business responsibilities."

65.     In the section "Honest and Ethical Conduct" the Code of Conduct states, in relevant part:

> It is the policy of Geron to promote high standards of integrity and ethics by conducting our affairs in an honest and ethical manner. The integrity and reputation of Geron depends on the honesty, fairness and integrity brought to the job by each person associated with us. Unyielding personal integrity is the foundation of corporate integrity. It is Geron's expectation that all of its directors, officers and employees, wherever located and regardless of function, conduct all activities in accordance with high standards of integrity and ethics, and in compliance with the laws, regulations, and written directives in every country, as well as with this Code and all other corporate and governmental policies. This expectation extends to third parties with whom we may contract to conduct activities on our behalf.

66.     In the section "Legal Compliance" the Code of Conduct states, in relevant part:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

Obeying the law, both in letter and in spirit, is the foundation of this Code. Our success depends upon each employee's operating within legal guidelines and cooperating with local, national and international authorities. We expect employees to be familiar with and understand the legal and regulatory requirements applicable to their business units and areas of responsibility. We hold periodic training sessions to ensure that all employees comply with the relevant laws, rules and regulations associated with their employment. While we do not expect you to memorize every detail of these laws, rules and regulations, we want you to be able to determine when to seek advice from others prior to engaging in any conduct that may violate the Code. Therefore, every employee must not only abide by legal requirements but also with requirements in GERON'S policies and other documents. If you have a question related to compliance, it is important that you not hesitate to seek answers from your manager, an EMC member or the Compliance Representative. Disregard or violation of the law will not be tolerated. Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as GERON, to civil and/or criminal penalties. You should be aware that conduct and records, including emails and text messages, are subject to internal and external audits and to discovery by third parties in the event of a government investigation or civil litigation. It is in everyone's best interests to know and comply with our legal obligations because compliance is everyone's responsibility.

16

67.    In the section "Insider Trading" the Code of Conduct states:

17
18
19
20
21
22
23

Employees who have access to confidential (or "inside") information are not permitted to use or share that information for stock trading purposes or for any other purpose except to conduct our business. All non-public information about GERON or about companies with which we do business is considered confidential information. To use material non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is not only unethical, it is illegal. Employees must exercise the utmost care when aware of material inside information, and must comply with GERON'S Insider Trading Compliance Program.

24
25

68.    In the section "Conflicts of Interest" the Code of Conduct states, in relevant part:

26
27
28

We respect the rights of our employees to manage their personal affairs and investments and do not wish to impinge on their personal lives. At the same time, employees should avoid conflicts of interest that occur when their personal interests may interfere in any way with the performance of their

duties or the best interests of GERON. A conflicting personal interest could result from an expectation of personal gain now or in the future or from a need to satisfy a prior or concurrent personal obligation. We expect our employees to be free from influences that conflict with the best interests of GERON or might deprive GERON of their undivided loyalty in business dealings. Even the appearance of a conflict of interest where none actually exists can be damaging and should be avoided. Whether or not a conflict of interest exists or will exist can be unclear. Conflicts of interest are prohibited. If you have any questions about a potential conflict or if you become aware of an actual or potential conflict, and you are not an officer or director of GERON, you should discuss the matter with your supervisor or the Compliance Representative (as further described in Section 20). Supervisors may not authorize conflict of interest matters or make determinations as to whether a problematic conflict of interest exists. If the supervisor is involved in the potential or actual conflict, you should discuss the matter directly with the Compliance Representative. Officers and directors may seek authorizations and determinations from the Nominating and Corporate Governance Committee of GERON'S Board of Directors.

69.    In the section "Maintenance of Corporate Books, Records, Documents, and Accounts; Financial Integrity; Public Reporting," the Code of Conduct states, in relevant part:

The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, service providers, creditors, employees and others with whom we do business. As a result, it is important that our documents, books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.

70.    In the section "Waivers" the Code of Conduct states, in relevant part:

Any waiver of this Code for EMC members (including, where required by applicable laws, our principal executive officer, principal financial officer, principal accounting officer or controller (or persons performing similar functions)) or directors must be authorized only by our Board of Directors or, to the extent permitted by the rules of Nasdaq, a committee of the Board and

will be publicly disclosed to the extent required by applicable laws, rules and regulations. Any waiver of this Code for employees other than EMC members must be authorized by the EMC.

71.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Moreover, three of the Individual Defendants violated the Code of Conduct by engaging in insider trading, netting combined total proceeds of approximately $6.37 million. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

## GERON'S AUDIT COMMITTEE CHARTER

72.    Geron also maintains an Audit Committee Charter (the "Audit Committee Charter") which governs the Audit Committee's roles and responsibilities. The Audit Committee Charter states the following regarding the purpose of the Audit Committee:

> The purpose of the Committee is to oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company. The Committee shall assist the Board in fulfilling its oversight responsibilities relating to: the integrity of the financial statements and other information provided by the Company to any governmental body, regulatory agency or the public; the Company's system of internal controls regarding finance, accounting, financial reporting and public disclosures; the Company's compliance with legal and regulatory requirements and with ethics policies that management and the Board have established; the qualifications, independence, and performance of the Company's independent registered public accounting firm ("independent auditors"); and the Company's accounting and financial reporting processes generally. Consistent with this function, the Committee encourages continuous

improvement of the Company's policies, procedures and practices at all levels.

73.     Under the heading "Responsibilities and Duties," the Audit Committee Charter states the following:

> In carrying out its responsibilities, the Committee will endeavor to ensure that the corporate accounting and reporting practices of the Company are in accordance with all regulatory requirements and are of the highest quality. While the Committee has the responsibilities and powers set forth in this Charter, it is not the duty of the Committee to plan or conduct audits or to determine that the Company's financial statements are complete and accurate and are in accordance with generally accepted accounting principles. Management is responsible for the preparation, presentation, and integrity of the Company's financial statements and for the appropriateness of the accounting principles and reporting policies that are used by the Company. The independent auditors are responsible for auditing the Company's annual financial statements and for reviewing the Company's unaudited interim financial statements. Absent actual knowledge to the contrary, each member of the Committee shall be entitled to rely on the integrity of those persons within the Company and of the professionals and experts (including the Company's independent auditors) from which the Committee receives information and, absent actual knowledge to the contrary, the accuracy of the financial and other information provided to the Committee by such persons, professionals or experts.

74.     Under the same heading, in a subsection titled "Review of Financial Statements" the Audit Committee Charter states the following:

> The Committee shall:
>
> A. Prior to dissemination to the public: (i) review with the CEO, CFO, and/or CLO the accuracy of the financial statements contained in SEC Forms 10-Q, Forms 10-K and associated press releases issued by the Company; (ii) review and discuss with the CEO, CFO, and/or CLO any material, proposed compliance-related disclosures in the Company's annual and quarterly financial statements; (iii) prior to the issuance of earnings or announcement of guidance, the Committee shall review and approve any such disclosure with the CEO, CFO and/or CLO to ensure that the proposed disclosure has a reasonable basis and that material risks and contingencies are properly disclosed; and (iv) discuss with the CEO, CFO and/or CLO any earnings guidance provided to analysts and rating agencies, and other reports or

financial information submitted to any governmental body or the public in connection with such financial information, including any certification, report, opinion, or review rendered by the independent auditors.

B. Review with the CEO, CFO and/or CLO and the independent auditors the financial statements and disclosures under Management's Discussion and Analysis of Financial Condition and Results of Operations to be included in the Company's Forms 10-K or Forms 10-Q prior to filing, including their judgment about the quality and acceptability of the Company's accounting principles, the reasonableness of significant judgments, the clarity of the disclosures, and the degree of aggressiveness or conservatism of the Company's accounting principles and underlying estimates. The Committee shall discuss the results of the annual audit or quarterly review and any other matters required to be communicated to the Committee by the independent auditors under generally accepted auditing standards, including all critical audit matters ("CAMs") proposed by the independent auditor to be included in the independent auditor's annual audit report.

C. Following completion of the annual audit, review separately with management and with the independent auditors any significant difficulties encountered during the audit, including any restrictions experienced by the independent auditors on the scope of their work or access to required information. Among the items that the Committee should consider reviewing with the independent auditors are: (i) any accounting adjustments that were noted or proposed by the independent auditors but were "passed" (as immaterial or otherwise); (ii) any communications between the independent auditors' audit team and their national office with respect to auditing or accounting issues encountered during the audit; and (iii) any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditors to the Company. The Committee shall obtain assurances from the independent auditors that Section 10A(b) of the Exchange Act has not been implicated.

75.    Under the same heading, in a subsection titled "Establishment and Oversight of Policies, Programs, and Procedures" the Audit Committee Charter states the following:

The Committee shall:

A. Review with the Company's management and the independent auditors the results of their periodic analysis of significant financial reporting issues and practices, including changes in accounting principles and disclosure practices.

B. Discuss with the independent auditors the regular reports that such auditors are required to make to the Committee regarding (i) the critical policies and practices of the Company, (ii) the alternative treatments of financial information that are within generally accepted accounting principles and that the independent auditors have discussed with management, and (iii) all other material written communications between the independent auditors and management of the Company, such as any management letter, management representation letter, reports on observations and recommendations on internal controls, independent auditors' engagement letter, independent auditors' independence letter, schedule of unadjusted audit differences and a listing of adjustments and reclassifications not recorded, if any.

C. Consider and approve, if appropriate, significant changes to the Company's auditing and accounting principles and practices as suggested by the independent auditors, management, or non-management employees.

***

F. Review with the independent auditors and management the adequacy and effectiveness of the Company's accounting, financial, disclosure and other controls, both internal and external, of the Company, including the Company's legal and ethical compliance programs, and elicit any recommendations for the improvement of such internal control procedures or particular areas where new or more detailed controls or procedures are desirable, including the adequacy and effectiveness of the Company's information and cyber security policies, the internal controls regarding information security and any significant deficiencies and significant changes in internal controls. Particular emphasis should be given to the adequacy of such internal controls to expose any payments, transactions, or procedures that might be deemed illegal or otherwise improper.

G. Discuss with management the Company's policies and procedures with respect to risk assessment and risk management.

76.    In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

77.     Geron is a biopharmaceutical company which specializes in the development of cancer and other chronic degenerative disease-related therapies.

78.     Geron's only current product is a telomerase inhibitor known as RYTELO (imetelstat), which purports to reduce the growth of malignant cells and encourage the growth of healthy cells.

79.     More specifically, RYTELO is intended to treat lower-risk myeloid hematologic malignances for the treatment of lower-risk MDS and intermediate-2 or high-risk myelofibrosis.

80.     Geron has stated that "[l]ower-risk MDS is a progressive blood cancer with high unmet need, where many patients with anemia become dependent on red blood cell transfusions, which can be associated with clinical consequences and decreased quality of life."

81.     Geron has portrayed itself at all relevant times as being ". . . in a strong position for value creation," citing the "excellence and experience of [its] employees[,]" the "potential for significant commercial opportunities in transfusion-dependent, lower-risk MDS," and the uniqueness of the Company's product.

## FALSE AND MISLEADING STATEMENTS

### *February 28, 2024 Form 10-K, Press Release, and Earnings Call*

82.     On February 28, 2024, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2023 (the "2023 10-K"). The 2023 10-K was signed by Defendants Robertson, Scarlett, Aggarwal, Bir, Lawlis, McDonald,

Molineaux, O'Farrell, and Spiegel and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Scarlett and Roberston, stating that ". . . the information contained in the [2023 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

83.    With respect to Geron's plans for RYTELO commercially, the 2023 10-K stated the following, in relevant part:

> *If imetelstat is approved in lower-risk MDS for marketing by regulatory authorities, we plan to commercialize imetelstat ourselves in the U.S. Our U.S. launch strategy is designed to prepare imetelstat, the market and the company to ensure broad reimbursement and deliver a seamless customer experience to all stakeholders at launch. Several long-lead time activities have already been completed, such as securing a global trademark for the imetelstat brand name; finalizing third party logistics, our distribution network, and our patient support providers; and onboarding highly experienced commercial and medical affairs leadership teams. We continue to conduct pre-commercial preparations for the U.S., such as enhancing and/or establishing company processes and systems to support a potential commercial launch, refining our market research in lower-risk MDS, engaging in marketing and commercial access/reimbursement preparatory efforts, and hiring our sales force, which we expect to occur in the first and second quarters of 2024. We continue to evaluate our strategy for the potential launch and commercialization of imetelstat in Europe.* Based on our internal estimates of pricing and addressable patient populations in 2031 and if regulatory authorities approve imetelstat for marketing in lower-risk MDS and relapsed/refractory MF, we believe the potential combined total addressable market opportunity in the U.S. and Europe for imetelstat is approximately $7.0 billion, of which lower-risk MDS represents approximately $3.5 billion and relapsed/refractory MF represents approximately $3.5 billion.

84.    The same day, the Company issued a press release to disclose its fourth quarter and full year financial results for 2023. In relevant part, the press release stated:

> "Geron's progress and execution throughout 2023 has paved the way for a potentially transformational 2024, as we plan for the transition to becoming a commercial company," said [Defendant] Scarlett[.] "*We believe that we are in a strong position for value creation, based on our differentiated product candidate, the potential for significant commercial opportunities in*

***transfusion-dependent, lower-risk MDS and relapsed/refractory MF, the excellence and experience of our employees, and the strength of our balance sheet to support a potential U.S. launch.***"

85.     Also on February 28, 2024, the Company held an earnings call to discuss its fourth quarter and full year results for 2023 (the "2023 Q4 Earnings Call"). During the call, Defendant Scarlett stated the following, in relevant part:

[W]e ended 2023 with a strong cash position of approximately $378 million, which based on our current plans and expected available resources, we expect will enable us to fund a potential successful launch in transfusion dependent low risk MDS in the US and fund our planned operations into the third quarter of 2025.

***We believe our differentiated product candidates, the very important commercial opportunities in transfusion dependent low risk MDS and relapse/refractory MF, the excellence and experience of our employees, and the financial resources to execute on our near-term milestones, puts us in a strong position for value creation.***

86.     Also during the 2023 Q4 Earnings Call, Defendant Kapur stated the following, in relevant part:

Approximately 10% of lower risk MDS patients are not eligible for ESAs and represent a very high unmet need subgroup. RS-negative patients make up approximately 75% of lower risk MDS patients and are a population particularly vulnerable to poor clinical outcomes. There are no therapies indicated for the treatment of anemia in RS negative patients once they are relapsed or refractory to ESAs. RS positive patients make up approximately 25% of the lower-risk MDS patients, and most who are high-transfusion burden lack effective treatment options. These underserved subgroups are at a greater risk for disease progression and suboptimal survival and are in the need for more effective treatment options.

Moving on to an update on US launch preparations, with our PDUFA date just about 3.5 months away, we have completed multiple critical launch readiness activities and plan to be ready to launch imetelstat in the US market upon potential approval. Long lead time activities such as securing our global trademark on our brand name, manufacturing of commercial supply are now complete. In preparation of launch, we have also finalized our distribution network and our patient support providers. In addition, we have onboarded

and fully integrated a highly experienced commercial and medical affairs team into Geron. We continue to transition Geron towards a commercial company with the integration and adoption of systems and processes to recognize and report revenues and the continued refinement of engagement plans with marketing, commercial access, payer and reimbursement stakeholders.

### March 14, 2024 Press Release

87.    On March 14, 2024, Geron issued a press release concerning the FDA's beneficial vote on benefit/risk profile of RYTELO. In the press release, which was titled "Geron Announces FDA Oncologic Drugs Advisory Committee Votes in Favor of the Clinical Benefit/Risk Profile of Imetelstat for the Treatment of Transfusion-Dependent Anemia in Patients with Lower-Risk MDS," the Company stated the following, in relevant part:

> "*We are pleased with the Committee's decision to recognize the positive clinical benefit/risk profile of imetelstat for the treatment of transfusion-dependent anemia in adult patients with lower-risk MDS.* There are few treatment options and significant unmet medical need remains for these patients, particularly among those with difficult-to-treat subtypes of this blood cancer," said [Defendant] Feller[.] "*We believe that imetelstat has the potential to be an important new medicine for patients* and look forward to continuing our collaboration with the FDA as they complete their review of our New Drug Application."

88.    The statements in ¶¶82-87 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the launch of RYTELO would be hindered by the weekly monitoring requirement, existing competition and seasonality, and a general lack of awareness in the health care industry of the treatment; (2) as a result of this, the launch of RYTELO would be less profitable than advertised; and (3) as a result of the foregoing, the Company would experience less growth than was advertised. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### 2024 Proxy Statement

89.    On March 27, 2024, the Company filed the 2024 Proxy Statement with the SEC. Defendants Scarlett, McDonald, Spiegel, Aggarwal, Bir, O'Farrell, Lawlis, and Molineaux solicited the 2024 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained materially false and misleading statements.

90.    The 2024 Proxy Statement called for shareholders to vote to, *inter alia*: (1) reelect Defendants Scarlett, McDonald, and Spiegel to the Board; (2) approve, on an advisory, non-binding basis, named executive officer compensation; and (3) ratify the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for 2024.

91.    Regarding the "Board's Role in Risk Oversight," the 2024 Proxy Statement stated the following, in relevant part:

> We are subject to a variety of risks, including those described under the section entitled "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2023. Some risks may be readily perceived and even quantified, while others are unexpected or unforeseeable. Risks can be external or can arise as a result of our internal business or financial activities. Our Board, as a whole, is responsible for broad oversight of all existing and emerging enterprise risk (over the short-, mid- and long-term) and of management's development and execution of mitigation strategies designed to address those risks. In this capacity, our Board has designated committees to assist in its oversight of particular key risks as described below. Oversight of additional matters of potential risk not delegated remain the responsibility of the full Board.

> While the Board and its committees oversee risk management, our senior management is responsible for identifying, assessing and mitigating risk on a day-to-day basis. Each committee of our Board meets regularly with key management personnel and, as desired by the applicable committee, outside advisors (including outside counsel, consultants and experts) to oversee risks associated with their respective principal areas of focus. In turn, each committee reports to the Board regularly, fostering awareness and communication of significant matters among all directors, and promoting a coordinated and cohesive approach to enterprise risk oversight. It is management's responsibility to identify various risks facing the Company, bring the Board's attention to material risks, and implement appropriate risk

management policies and procedures to manage risk exposure on a day-to-day basis.

92.    Regarding the Code of Conduct, the 2024 Proxy Statement stated the following:

> We believe our Code of Conduct reflects current industry and public company best practices, and it sets forth guiding principles and policies related to (i) compliance with health care laws and regulations, (ii) product quality, pharmacovigilance and regulatory compliance, and (iii) privacy and information security policies. Our Code of Conduct is available in its entirety on the Corporate Governance page in the Investors & Media section of our website at www.geron.com and to any stockholder otherwise requesting a copy. All our directors, employees and members of our executive management team, including our Chief Executive Officer and Chief Financial Officer, are required to adhere to the Code of Conduct in discharging their work-related responsibilities. Employees are required to report any conduct they believe in good faith to be an actual or apparent violation of the Code of Conduct. Amendments to the Code of Conduct, and any waivers from the Code of Conduct granted to our directors or members of our executive management team, will be made available through our website as they are adopted. Accordingly, we intend to satisfy the disclosure requirement under Item 5.05 of Form 8-K regarding an amendment to, or waiver from, a provision of the Code of Conduct by posting such information on our website at www.geron.com.

93.    Under the direction and watch of Defendants Scarlett, McDonald, Spiegel, Aggarwal, Bir, O'Farrell, Lawlis, and Molineaux, the 2024 Proxy Statement failed to disclose, *inter alia*, that: (1) the launch of RYTELO would be hindered by the weekly monitoring requirement, existing competition and seasonality, and a general lack of awareness in the health care industry of the treatment; (2) as a result of this, the launch of RYTELO would be less profitable than advertised; and (3) as a result of the foregoing, the Company would experience less growth than was advertised. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

94.    The 2024 Proxy Statement also failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual

Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's description of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

95.    As a result of Defendants Scarlett, McDonald, Spiegel, Aggarwal, Bir, O'Farrell, Lawlis, and Molineaux causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants McDonald, Scarlett, and Spiegel to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve named executive officer compensation on advisory basis; and (3) ratify the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for 2024.

**May 2, 2024 Press Release and Earnings Call**

96.    On May 2, 2024, the Company issued a press release concerning its financial results for the first quarter of 2024. In relevant part, the press release stated:

> "Since the FDA ODAC's 12 to 2 vote in favor of the clinical benefit/risk profile of imetelstat for the treatment of transfusion-dependent anemia in patients with lower-risk MDS in March, we have continued working with the FDA as they complete their review of our New Drug Application, which has a June 16, 2024 PDUFA target action date," said [Defendant] Scarlett[.] "***We are actively preparing for a successful launch of imetelstat in the U.S., if approved, including most recently onboarding our sales force last month, refining our market research and completing buildout of our enterprise capabilities and systems to support our transition from a clinical to commercial-stage company.***" . . . Geron has now completed onboarding its commercial team, with the buildout of the full sales organization in April. ***Other commercial preparations for the U.S. are ongoing and on target, including enhancing and/or establishing company processes and systems to support an expected commercial launch, refining market research in TD LR-MDS, and engaging in marketing, commercial access, payer, and reimbursement preparatory efforts.***

97.    Also on May 2, 2024, the Company hosted an earnings call to discuss its

financial results for the first quarter of 2024 (the "2024 Q1 Earnings Call"). During the call, Defendant Scarlett stated, in relevant part:

> We're poised for a successful U.S. launch of Imetelstat for the treatment of transfusion-dependent anemia in patients with lower risk MDS. If approved we're deeply excited for the opportunity to bring patients what we believe is an important and differentiated medicine. With our PDUFA date on June 16th, we continue to work closely with the FDA as they complete the review of our new drug application.
>
> ***
>
> In short, we're building on our momentum acting with urgency and fully confident in our readiness for U.S. launch on potential approval. We're also financially well-resourced to support the planned U.S. commercial launch with approximately $465 million on the balance sheet as of March 31 of this year. On the heels of the highly positive ODAC outcome, we raised approximately $141 million in net proceeds from an underwritten public offering of common stock and a pre-funded warrant.

98.    Also during the 2024 Q1 Earnings Call, Defendant Kapur stated, in relevant part:

> **We believe that we are positioned very well for commercial value creation and are well-prepared to execute a successful U.S. launch upon potential approval.** As [Defendant Scarlett] mentioned in April, we completed the build-out of our full commercial organization with the hiring of our sales force, which is being now integrated and trained so that they will be prepared to be deployed in the field upon potential approval.
>
> ***
>
> **To support our launch preparation and commercial strategy, we have collected extensive market insights which suggest that Imetelstat is highly differentiated in this transfusion-dependent low-risk MDS market. Our research has shown that medical and payer stakeholders are dissatisfied with available options in the low-risk MDS space which we believe creates an opportunity for Imetelstat.**
>
> ***
>
> We expect to see Imetelstat uptake across ESA ineligible, ESA failed, RS negative, and RS positive high transfusion burden patients. Based on our latest 2024 market research of 50 U.S.-based practicing hematologists across both community and academic settings, on the left-hand side of the slide, you can see that our market research suggests meaningful Imetelstat use in frontline ESA ineligible patients, especially those who are RS negative.

\*\*\*

*We believe we are well-positioned to capitalize on Imetelstat opportunity in transfusion-dependent low-risk MDS by building on the unique product profile and executing on the launch critical success factors that are driving our commercial plan.* From a prescriber's perspective, we have a few important goals that prescribers embrace the totality of clinical benefit achievable with Imetelstat and understand the efficacy profiles across MDS subgroups, including RS negative and high-transfusion burden patients.

*June 6, 2024 Press Release*

99.    On June 6, 2024, the Company published a press release titled "Geron Announces FDA Approval of RYTELO (imetelstat), a First-in-Class Telomerase Inhibitor, for the Treatment of Adult Patients with Lower-Risk MDS with Transfusion-Dependent Anemia." In relevant part, the press release stated:

> "*With the approval and availability of RYTELO, we believe eligible patients with lower-risk MDS can potentially experience meaningful clinical benefit, particularly the potential for greater than 24 weeks of freedom from the burden of red blood cell transfusions and symptomatic anemia,*" said [Defendant] Scarlett[.] "*The approval of RYTELO as the first telomerase inhibitor is a testament to the power of our science and the passion of our people to innovate in the field of blood cancer.* As we celebrate today's momentous milestone, I would like to thank the patients and families, advocates, clinicians, study coordinators and site personnel, scientists, and Geron employees and collaborators past and present whose participation was integral to this achievement and to supporting our transformation into a commercial company."

\*\*\*

IMPORTANT SAFETY INFORMATION

WARNINGS AND PRECAUTIONS

Thrombocytopenia

RYTELO can cause thrombocytopenia based on laboratory values. In the clinical trial, new or worsening Grade 3 or 4 decreased platelets occurred in 65% of patients with MDS treated with RYTELO.

Monitor patients with thrombocytopenia for bleeding. *Monitor complete blood cell counts prior to initiation of RYTELO, weekly for the first two*

*cycles, prior to each cycle thereafter, and as clinically indicated.* Administer platelet transfusions as appropriate. Delay the next cycle and resume at the same or reduced dose, or discontinue as recommended.

Neutropenia

RYTELO can cause neutropenia based on laboratory values. In the clinical trial, new or worsening Grade 3 or 4 decreased neutrophils occurred in 72% of patients with MDS treated with RYTELO.

Monitor patients with Grade 3 or 4 neutropenia for infections, including sepsis. *Monitor complete blood cell counts prior to initiation of RYTELO, weekly for the first two cycles, prior to each cycle thereafter, and as clinically indicated.* Administer growth factors and anti-infective therapies for treatment or prophylaxis as appropriate. Delay the next cycle and resume at the same or reduced dose, or discontinue as recommended.

### *June 7, 2024 Special Investor Call*

100.   On June 7, 2024, the Company hosted a special investor call concerning the FDA's approval of RYTELO. During the call, Defendant Feller described the weekly monitoring requirement of the treatment as "standard." Also during the call, Defendant Kapur stated that the weekly monitoring requirement was not considered a burden by either the academic or medical communities.

101.   Also during the call, Defendant Scarlett made comments regarding RYTELO's recent FDA approval. In relevant part, Defendant Scarlett stated:

RYTELO is now the first and only FDA-approved telomerase inhibitor.

. . .

The approval of RYTELO, with lower-risk MDS, with transfusion-dependent anemia, broadly across ESA ineligible and ESA relapse and refractory subpopulations, regardless of ring sideroblast or RS status, has the potential to transform the treatment paradigm for these patients who remain in high unmet need despite currently available treatment options. Approximately 10% of lower-risk MDS patients are not eligible for ESAs and have very limited treatment options. RS-positive patients make up approximately 25% of lower-risk MDS patients, and we must continue to experience high transfusion burden despite available therapies.

*RS-negative patients make up approximately 75% of lower-risk MDS patients in our population particularly vulnerable to poor clinical outcomes. There are approximately 13,200 U.S. patients with lower-risk MDS who need treatment for symptomatic anemia.* We believe that RYTELO can become part of the standard of care and help address unmet need in lower-risk MDS patients with transfusion-dependent anemia who are ESA ineligible, ESA relapsed/refractory RS-negative and ESA relapsed/refractory RS-positive with high transfusion burden.

102.    Also during the call, Defendant Kapur made comments regarding RYTELO's market performance. In relevant part, Defendant Kapur stated:

*On this next slide, we believe RYTELO offers a compelling value proposition for stakeholders.* Lower-risk MDS is a blood cancer that often progresses to require increasingly intensified management of key symptoms such as anemia and resulting fatigue. Many lower-risk MDS patients with symptomatic anemia frequently become red blood cell transfusion dependent, which has been shown to be associated with short- and long-term clinical consequences that reduce quality of life and survival. *There is a high unmet treatment need for patients with lower-risk MDS as many progress and are not responding to current treatments, achieving a durable response or experiencing extended and continuous red blood cell transfusion independence.*

. . .

From our perspective, these guidelines reflect a lack of effective new treatment options, in particular, for those patients who are ESA ineligible high-transfusion burden patients and for RS negative lower-risk MDS patients who constitute an estimated 75% of this market. This is a need, we believe, RYTELO can powerfully address as a potential, durable treatment that can be used broadly across these MDS subtypes. We expect to see RYTELO uptake across ESA ineligible, ESA failed RS-negative and RS-positive high transfusion burden patients. Based on our latest market research, which was completed earlier this month, with 37 community and 20 academic U.S.-based practicing hematologist.

On the left-hand side of this slide, as you can see, our research suggests meaningful RYTELO use in frontline ESA-ineligible patients. The right-hand side of the slide shows the estimated second-line population, approximately 85% of which are expected to be ESA or luspatercept experience. *Our research suggests a broad use of RYTELO across the second line regardless of frontline therapy and particularly for RS-negative patients. Our research*

1
2
3

***supports the significant unmet treatment needs for the low-risk MDS patient population, and we strongly believe that RYTELO can play a meaningful role for eligible low-risk MDS patients moving forward.***

4
5
6
7
8

***We plan to conduct a prioritized and targeted launch to a concentrated prescriber base of approximately 8,000 health care professionals. We also plan to cover approximately 2,200 targeted accounts and 70% of the patients are expected to be treated in the community setting with low-risk MDS***. As an infused product, RYTELO will be provider administered. Medicare is expected to be the predominant payer with approximately 84% of the patients falling under the Medicare umbrella.

9

    103.    Later during the call, Defendants answered multiple questions concerning

10

RYTELO's launch in the following conversations:

11
12
13
14

<Q: Tara A. Bancroft – TD Cowen – VP & Senior Equity Research Analyst> Congrats on the approval and the great label. Can you describe more about your expectations for the cadence of the launch? Like what are the lowest hanging fruits to address first? And will there be a bolus of initial patients, things like that?

15
16
17
18
19
20
21
22

<A: John A. Scarlett> Anil?

<A: Anil Kapur> Sure. Thank you for the question, Tara. I think boluses are hard, Tara, to define and quantify. What I will say is, what's become very clear is we are launching in a sensitized market and this market is dissatisfied with current options. As you say, the patients who are probably at the highest requirement for new therapies include patients who are either RS-negative, which is a large patient population, patients who are high transfusion burden and patients who may have seen both ESAs and/or luspatercept and are looking for better treatment options. And I think we are going to see a mix of all of these patients. But in general, the unmet need within this market is very high, and RYTELO has differentiated data to address all of the subpopulations.

                                           . . .

23
24
25
26
27
28

<Q: Craig for Corrine Johnson – Goldman Sachs - Analyst> . . . So to start us off here, the label indicates that the drug is indicated for patients who require 4 or more transfusions in 8 weeks. So what portion of the patients does this apply to?

<A: John A. Scarlett> Go ahead, Anil.

<A: Anil Kapur> Great question, Craig. So Craig, just to step back for a second. I just want to note again that low-risk MDS is a progressive disease and transfusion burden, as we have seen through all the clinical publications

and real-world data, only continues to increase over time and continues to increase from one therapy to another. Our research and also data that was published by Dr. Rami at ASH 2023 showed from the real-world data set, approximately 50% of the patients are high transfusion burdens, which are 4 or more. In addition, our research also indicates that transfusion burden, in the eyes of a physician, is a sliding scale, with many physicians, approximately 80% plus of the physicians we have gone to research with indicating even one or higher on a regular basis is not satisfactory to them. So we expect a vast majority of the patients who are transfusion burden to be provided access to RYTELO. In addition, the NCCN guidelines will help with our adoption as well. So I'll just stop here to see if I answered your question.

. . .

<Q: Kalpit R. Patel – B. Riley Securities, Inc. – Senior Biotech Analyst> Many congrats on the approval yesterday. As you sort of model out the launch for imetelstat, what are your expectations for the real world average number of cycles, considering that there are more RS-negative patients in the real world than in the clinical trial settings?

<A: Anil Kapur> So Kalpit, we have not provided that guidance. Our expectation is that duration of treatment across both RS-positive and RS-negative and for all the populations we spoke about is likely to be guided by the totality of clinical evidence and how the patient -- as we said, across the factors, which include achievement of transfusion independence, but also the clinical characteristics that we speak about that physicians monitor for patients, including what they are seeing for hemoglobin rises and how the patient is feeling and decreases in RBC transfusions. So we will look at RYTELO, we expect RYTELO to behave in a similar way as well within this marketplace and provide more information when appropriate.

<Q: Kalpit R. Patel> Okay. And one more question maybe. Any thoughts on the weekly monitoring requirements for the first 2 cycles and every cycle thereafter? How similar or dissimilar is that from your clinical trial protocol? And does that weekly monitoring impact a particular group of physicians, maybe community doctors? All I'm trying to ask is how reasonable is it to do this for those types of doctors?

<A: Anil Kapur> Faye, do you want to go for it and I can add?

<A: Faye Feller> Yes. Yes. I can take that. Hi Kal. So it is consistent with what was done on the Phase III IMerge study weekly for the first 2 cycles and then monthly prior to dosing in order to manage any potential dose modifications. This is pretty standard across 4 hematologists, I would say, as closer monitoring, especially in this patient population, it's often merited regardless of what drug you're starting in the beginning of treatment as a patient adjusts to the new treatment and the side effect profile, while monthly

patients have received RYTELO, which is encouraging given the very early stage of this launch. Further, the MDS NCCN Guidelines, which guide clinical decision-making, prescriber behavior and reimbursement decisions, were updated at the end of July to include RYTELO as a Category 1 and 2A treatment of symptomatic anemia in patients with lower-risk MDS. With the introduction of RYTELO as a new therapeutic option, we are seeing increasing dialogue among hematologists rethinking treatment approaches for eligible patients with lower-risk MDS with transfusion-dependent anemia, regardless of ring sideroblast status, and we believe that RYTELO can become part of the standard-of-care for these patients."

107.    Also on August 8, 2024, the Company held an earnings call to discuss its financial results for the second quarter of 2024 (the "2024 Q2 Earnings Call"). During the call, Defendant Scarlett stated, in relevant part:

***With our strong commercial infrastructure in place at launch and the efficient mobilization of our field teams, we've seen encouraging early launch results. As of July 31, 60% of the top decile 1-4 accounts had been reached by our team across both community and academic settings. This has led to gratifying uptake. We estimate, again, as of July 31, that approximately 160 patients have received RYTELO, which is quite encouraging given the very early stage of this launch.***

The enthusiastic reception for RYTELO that we've seen within the hematology community reinforces the unmet needs for lower-risk MDS patients with symptomatic transfusion-dependent anemia. Many of our customers are passionate about getting access to RYTELO for their patients, and we've seen a strong push across the U.S. to add RYTELO to formularies, treatment pathways, and EMRs, including in the community setting.

108.    Defendant Scarlett also stated, in relevant part:

It was just 8 weeks ago that FDA approved RYTELO, our branded name for imetelstat as the first and only telomerase. And it was just 6 weeks ago that RYTELO became commercially available in the U.S. With our strong commercial infrastructure in place at launch and the efficient mobilization of our field teams, we've seen encouraging early launch results. As of July 31, 60% of the top decile 1 to 4 accounts have been reached by our team across both community and academic settings. This has led to gratifying uptake. We estimate again as of July 31 that approximately 160 patients have received RYTELO, which is quite encouraging given the very early stage of this launch. The enthusiastic reception for RYTELO that we've seen within the

hematology community reinforces the unmet needs for lower-risk MDS patients with symptomatic transfusion-dependent anemia. Many of our customers are passionate about getting access to RYTELO for their patients, and we've seen a strong push across the U.S. to add RYTELO to formularies, treatment pathways and EMRs, including in the community setting. In addition, the MDS NCCN guidelines were updated this July 25 to include RYTELO as a category 1 and 2A treatment for lower-risk MDS patients. That is, RYTELO is now designated for use in both RS positive and RS negative first-line ESA ineligible patients as well as in both RS positive and RS negative secondline patients regardless of prior first-line treatment. We believe that these favorable NCCN guidelines have put RYTELO in a strong competitive position.

. . .

With the introduction of RYTELO as a new therapeutic option, we're seeing increasing dialogue among hematologists, rethinking treatment approaches for eligible low-risk MDS patients with transfusion dependent anemia. Consequently, we believe that RYTELO can become part of the standard of care for both eligible first and second-line patients. As shown on this slide, from the approximately 13,200 U.S. patients with lower-risk MDS who need treatment for symptomatic anemia, approximately 1 in 10 are ESA ineligible due to serum EPO levels higher than 500 mU/mL. These first-line patients have limited treatment options. RS-positive patients make up approximately 25% of the lower-risk MDS patient population, many of whom continue to experience high transfusion burden despite available therapies. RS-negative patients make up approximately 75% of lower-risk MDS patient populations, many of whom are particularly vulnerable to poor clinical outcomes and have few other treatment options.

109.   Defendant Grethlein thereafter discussed growth expectations for RYTELO. In relevant part, Defendant Grethlein stated:

First, we are pleased with the early awareness of RYTELO among prescribers and payers. Based on our market research before FDA approval in May of 2024 of over 100 U.S. hematologists and oncologists, over 80% of those surveyed were aware of imetelstat. One in 3 surveyed physicians indicated familiarity with the clinical data and a majority of these physicians look favorably on the efficacy profile and mechanism of action, which is especially important for a first-in-class treatment. Payers are expressing high levels of interest and already have a strong understanding of the RYTELO U.S. prescribing information and IMerge Phase 3 clinical data. From an operational perspective, both dosage strengths of RYTELO, the 188 mg vials and 47 mg

vials were available in our distribution channel for customers to order from specialty distributors as of June 27, 2024. Our distribution network is fully activated with our specialty distributor network actively supporting customer demand across hospitals and community oncology clinics. Across the contiguous 48 states, RYTELO is available to HCPs within 24 to 48 hours from our specialty distribution networks. We also believe that RYTELO's inclusion in the updated NCCN guidelines has been important in spreading awareness among the prescriber community.

. . .

We believe that the strong RYTELO value proposition, commercial foundation and the execution of our entire organization is driving encouraging early results over these first 6 weeks of launch. As we commented earlier, we estimate that as of July 31, 2024, approximately 160 patients have received RYTELO. This demand was generated in part by reaching approximately 60% of top decile 1 through 4 accounts and includes orders from roughly 115 unique accounts. We are seeing an encouraging range of customers ordering RYTELO in these early days from small community to large aggregator accounts with hospitals ranging from community, academic centers, teaching hospitals and large health systems. In July, we kicked off our national speakers program with the launch of our national broadcast event featuring medical experts, which garnered over 300 medical professional participants. These events are a critical component of our marketing strategy to make sure HCPs are aware of the new treatment option for their eligible patients.

110. Later on the call, Defendant Robertson discussed the Company's financials, stating, in relevant part:

Based on our current operating plans and assumptions, we believe that our existing cash, cash equivalents and marketable securities, together with our projected revenues from U.S. sales of RYTELO, will be sufficient to fund our projected operating requirements into the second quarter of 2026.

***September 9, 2024 Press Release***

111. On September 9, 2024, the Company issued a press release regarding Defendant Ziegler. Following Defendant Kapur's departure from the Company, the press release noted ". . . the appointment of Jim Ziegler, as Executive Vice President, Chief Commercial officer, effective today, September 9, 2024." The release also stated that the purpose of Defendant Ziegler's hiring was to ". . . spearhead Geron's global commercial

strategy and operations, lead the commercial organization and be responsible for driving growth of RYTELO ™."

112.    Also, in addition to discussing Defendant Ziegler's addition to the Company, Defendant Scarlett stated "Jim brings to Geron an impressive track record of operational excellence, having led multiple high performing teams through product launches. We are thrilled to welcome Jim at this critical time when RYTELO is commercially available in the U.S. and we are seeing encouraging uptake since its launch at the end of June 2024."

113.    In further consideration of his appointment within the Company, Defendant Ziegler stated: "Geron already has a strong commercial organization and infrastructure in place, and I look forward to partnering with the team to drive a successful U.S. launch and the commercial potential of RYTELO."

***November 7, 2024 Press Release and Earnings Call***

114.    On November 7, 2024, the Company issued a press release to disclose its financial results for the third quarter of 2024. The press release stated, in relevant part:

> "This has been a transformative year for Geron, following our first FDA approval and commercial launch of RYTELO in June. ***The initial full quarter of product revenue from our U.S. launch exceeded our expectations and demonstrates strong execution as a commercial company. These results also reflect the high unmet need in lower-risk MDS and the compelling value proposition of RYTELO for hematologists and patients, giving us confidence in future continued demand and momentum for RYTELO***," said [Defendant] Scarlett[.] "We were also pleased to announce this morning the completion of important synthetic royalty and debt financing transactions with Royalty Pharma and Pharmakon Advisors. We believe that the favorable terms in these transactions reflect the significant commercial potential of RYTELO and provide us with critical flexibility to fuel continued growth and invest in our future."

> Recent Business Highlights

> - ***Strong execution in the first full quarter of U.S. launch, with net product revenue for RYTELO (imetelstat) of $28.2 million in the third quarter of 2024.***

115.   Also on November 7, 2024, the Company hosted an earnings call to discuss its financial results for the third quarter of 2024 (the "2024 Q3 Earnings Call"). During the call, Defendant Scarlett stated, in relevant part:

Following FDA approval and the commercial launch of RYTELO, our first-in-class telomerase inhibitor, this has been a transformative year for Geron. ***As a result, we believe we're well-positioned to build long-term commercial value with this product.***

In our first full quarter on the market in the United States, we achieved $28.2 million in RYTELO net product revenue, which exceeded our expectations. ***The initial quarter of product revenue speaks to our execution as a commercial company, as well as the high unmet need in lower-risk MDS and the compelling value proposition of RYTELO for hematologists and patients. This gives us confidence in future continued demand and momentum for RYTELO.***

Our strong IP position underlies the long-term commercial value proposition for RYTELO. We believe this IP position, including specific claims and our patents covering the indication that's in our FDA label and buttressed by the FDA's grant of orphan drug exclusivity for lower-risk MDS into June of 2031, will provide exclusivity in the United States through August of 2037. Today, our primary focus is on continuing to deliver on the initial success we achieved in the third quarter, getting RYTELO to more eligible lower-risk MDS patients and maximizing our opportunity in the U.S. market. In Europe, we believe that the CHMP review of our RYTELO marketing authorization application in lower-risk MDS could be completed in late 2024 or early 2025 with potential EU approval in the first half of 2025. Subject to receiving this approval, we're continuing to prepare for the potential launch of RYTELO in the EU and are planning to commercialize RYTELO in select EU markets beginning in 2026.

. . .

In addition to this quarter's strong commercial performance, we were pleased to announce this morning a completion of both the synthetic royalty transaction and a debt financing transaction that together generated $250 million in gross proceeds. These transactions were comprised of $125 million capped synthetic royalty with Royalty Pharma and a $250 million committed senior secured debt facility with funds managed by Pharmakon Advisors, under which we've borrowed $125 million, allowing us to retire existing debt. With this new debt facility, we also have access to an additional $125 million.

1

2

3

4

We believe that the favorable terms we achieved in these transactions reflect the significant commercial potential of RYTELO and coming off a successful first quarter of commercial launch provide us with critical flexibility to fuel continued growth and investment in our future. Michelle will provide more details on these transactions and on our Q3 results later on this call.

5

6

116.   Also during the 2024 Q3 Earnings Call, Defendant Ziegler stated, in relevant part:

7

8

As Chip highlighted, we achieved $28.2 million in RYTELO net product revenues in our first full quarter of U.S. sales.

9

10

11

12

In the first few months of launch, demand has increased month-over-month with Q3 performance exceeding our expectations. Demand from launch through Q3 has come from 388 ordering centers, which represents approximately 45% of our key targeted accounts. This strong start reinforces the high unmet need in RYTELO's clinical profile in first line ESA ineligible and second line plus lower-risk MDS.

13

14

15

16

17

Our market research indicates treating physicians appreciate RYTELO's differentiated clinical profile in 24-week and one year red blood cell transfusion independent rates, median duration of red blood cell transfusion independence and hemoglobin rise. We believe RYTELO's strong clinical data support broad utilization across treatment eligible patient sub-groups in both community and academic settings.

18

***

19

20

21

*From our own internal demand sales data, so far the RYTELO sales growth trajectory in the Q4 continues to be promising. Overall, we remain confident in our launch progress to date, continued demand for RYTELO, expected momentum into 2025 and the projected long-term growth of the brand.*

22

23

24

*Our number one commercial priority is to deliver a strong U.S. launch. We are committed to keeping laser focused on that objective. We plan to leverage our U.S. launch experience to also prepare for commercialization in select EU countries in 2026 and beyond.*

25

26

27

117.   The statements in ¶¶96-116 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the launch of RYTELO would be hindered by the weekly monitoring requirement, existing competition and seasonality, and a general lack

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

of awareness in the health care industry of the treatment; (2) as a result of this, the launch of RYTELO would be less profitable than advertised; and (3) as a result of the foregoing, the Company would experience less growth than was advertised. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **The Truth Emerges**

118.   On February 26, 2025, the Company issued a press release announcing its financial results for the fourth quarter and full 2024 year. The press release stated, in relevant part:

Net Loss

For the three and twelve months ended December 31, 2024, the Company reported a net loss of $25.4 million, ***or $0.04 per share***, and $174.6 million, or $0.27 per share, respectively, compared to $52.0 million, or $0.09 per share, and $184.1 million, or $0.32 per share, respectively, for the three and twelve months ended December 31, 2023.

Revenues

Total product revenue, net for the three and twelve months ended December 31, 2024, was ***$47.5 million*** and $76.5 million, respectively. There was no product revenue in the prior year periods, given that RYTELO was approved by the FDA in June 2024.

Total net revenue for the three and twelve months ended December 31, 2024, was ***$47.5 million*** and $77.0 million, respectively, compared to $23,000 and $237,000 for the same periods in 2023. Total net revenue includes license fees and royalties in addition to any product revenue, net. The increase in revenue is due to product revenue from U.S. sales of RYTELO, which was approved by the FDA in June 2024.

119.   Also on February 26, 2025, the Company hosted an earnings call to discuss its financial results for the fourth quarter and full 2024 year (the "2024 Q4 Earnings Call"). During the call, Defendant Scarlett stated, in relevant part:

From a financial perspective, we ended the year with a strong cash position of

approximately $503 million, which we expect will enable us to reach profitability without additional financing, if our internal sales and operating expense expectations are met. ***However, despite achieving this revenue in the first two quarters of launch, we have observed flat revenue trends over the last few months.***

120.    Also during the 2024 Q4 Earnings Call, Defendant Ziegler stated, in relevant part:

As described previously by [Defendant Scarlett], we achieved $47.5 million in RYTELO net product revenues in the fourth quarter 2024. This demand for RYTELO was supported by strong payer access. Payers responsible for approximately 80% of the U.S. covered lives have implemented medical coverage policies for RYTELO, that are consistent with the FDA label, clinical trials and/or NCCN guidelines.

***New patient starts on duration of treatment are the key primary drivers of revenue.*** For duration of treatment, it is important to note that even the longest treated patients in the commercial setting are just hitting the median of approximately eight months observed in the Phase 3 IMerge trial and our market research suggests the duration of treatment in commercial RYTELO patients treated to date appears consistent with that observed in IMerge.

***However, with respect to new patient starts, we have observed flatness over the past few months. Specifically, even though we see RYTELO utilized across RS-negative and RS-positive first line ESA ineligible, second line ESA relapse refractory and third-line plus patients. The majority of new patient starts have come from the third line plus patient segment with the second line new patient starts lower than our expectations.***

\*\*\*

We are also assessing other possible root causes for the flat revenue trends and have implemented or are in the process of implementing several changes such as scaling up our analytics capabilities, refining our segmentation and targeting and improving our promotional and sales force effectiveness, which we believe will help us more fully capture the significant commercial opportunity for RYTELO in lower-risk MDS[.]

As shown on Slide 8 in our earnings deck, we estimate that in 2025, the U.S. RYTELO total addressable lower-risk MDS patient population is approximately 15,400 patients and includes patients recommended in the NCCN guidelines. This includes approximately 3,400 first line ESA ineligible

patients, approximately 7,600 second line and 4,400 third line plus patients with approximately 75% of patients with RS negative and 25% of patients with RS positive status.

As I mentioned, our efforts are particularly focused on the eligible RS-negative population where RYTELO is the only drug approved for ESA relapsed/refractory patients. Assuming the duration of treatment observed in IMerge and based on the current net price, ***there is potential to achieve blockbuster status by treating approximately 1/3 of the U.S. RYTELO, total addressable patients.***

121.    Also during the 2024 Q4 Earnings Call, when asked about seasonality, Defendant Ziegler stated "***we saw some seasonality beginning around the holidays*** [. . . .] And there is some ***hesitancy in the market to start some of these products that require, in our case, some monitoring.*** So there was a little bit of a delay." When discussing the Company's new patient starts, Defendant Ziegler stated "[o]n new patient starts, we're seeing repeat prescriptions amongst the early adopters ***largely at many of the academic medical centers. In the community, it's a little bit more diffused.***"

122.    Shortly after, market analysts noted the Company's lackluster results for the fourth quarter of the 2024 fiscal year, particularly regarding the subpar launch of RYTELO. Indeed, investment bank Barclays reported the same day that its stock price target for Geron had been lowered from $9 to $4. In relevant part, Barclays stated:

We spoke to management. Slowdown seen over the last 2 months, correction in place. We update our model to reflect the slowdown, with potential revenue turnaround in 2025, but out of an abundance of caution we cut estimates and [price target] from $9 to $4. Next catalysts: revenues and EU approval.

We spoke to management. Our takeaways from Geron's 4Q24 earnings update:

-   **Slowdown in sales growth expected in 1Q25**. Management noted Rytelo new patient start flatness over the past few months (specifically 4- and 8- week rolling averages), with ***seasonality impact*** that started around the Thanksgiving holidays in 2024, and ***some hesitancy around starting products that require monitoring. Competitive dynamics also appear to be a headwind, and the majority of new starts are coming***

*from the 3L+ LRMDS setting, while second line starts have been lower than expectations.*

123.    On this news, the price of the Company's stock fell $0.76 per share, or approximately 32.06%, from a closing price of $2.37 per share on February 25, 2025 to close at $1.61 per share on February 26, 2025.

## SUBSEQUENT DEVELOPMENTS

124.    On March 10, 2025, the Company issued a current report on Form 8-K with the SEC regarding personnel changes within its corporate structure. Specifically, Defendant Scarlett stepped down from his positions as President, CEO, and chairman of the Board of Directors, effective March 10, 2025. Defendant Bir was appointed interim President and CEO in his place, and Defendant O'Farrell was appointed chair of the Board.

## DAMAGES TO GERON

125.    As a direct and proximate result of the Individual Defendants' conduct, Geron has lost and will continue to lose and expend many millions of dollars.

126.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy any judgment associated with the Securities Class Actions, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

127.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

128.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

129.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who

breached their fiduciary duties to the Company.

130.    As a direct and proximate result of the Individual Defendants' conduct, Geron has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

131.    Plaintiff brings this action derivatively and for the benefit of Geron to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors, and/or officers of Geron, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Exchange Act.

132.    Geron is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

133.    Plaintiff is, and has been at all relevant times, a shareholder of Geron. Plaintiff will adequately and fairly represent the interests of Geron in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

134.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

135.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Geron's Board consisted of the following seven individuals: Defendants McDonald, Aggarwal, Bir, Spiegel, O'Farrell, Lawlis, and Molineaux (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to four of the seven Director-Defendants that were on the Board at the time this action was filed.

136.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of

the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

137.    Moreover, all of the Director-Defendants solicited the false and misleading 2024 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect Defendants Scarlett, McDonald, and Spiegel to the Board for a three-year term, thereby allowing them to continue breaching their fiduciary duties to the Company.

138.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Geron to issue materially false and misleading statements. Specifically, the Director-Defendants caused Geron to issue false and misleading statements which were intended to make Geron appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and demand upon them is futile, and thus excused.

139.    Additional reasons that demand on Defendant McDonald is futile follow. Defendant McDonald has served as a Company director since September 2022. Defendant McDonald also serves as a member on both the Audit Committee and the Strategic Committee. Defendant McDonald has received and continues to receive handsome compensation from the Company for his role as a director. Defendant McDonald also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Scarlett, Spiegel, and himslef to the Board for a three-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. He also signed the false and misleading 2023 10-K. As a trusted Company

director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant McDonald breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

140.  Additional reasons that demand on Defendant Spiegel is futile follow. Defendant Spiegel has served as a Company director since May 2010. He also serves as a chairman of the Compensation Committee. Defendant Spiegel has received and continues to receive handsome compensation for his role as a director. Defendant Spiegel also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Scarlett, McDonald, and himself to the Board for a three-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. He also signed the false and misleading 2023 10-K. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Spiegel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

141.  Additional reasons that demand on Defendant Aggarwal is futile follow. Defendant Aggarwal has served as a Company director since November 2023. He also serves as the chair of the Strategic Committee and as a member of the Compensation Committee. Defendant Aggarwal has received and continues to receive handsome compensation for his role as a director. Defendant Aggarwal also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Scarlett, McDonald, and Spiegel to the Board for a three-year term,

thereby allowing them to continue breaching their fiduciary duties to the Company. He also signed the false and misleading 2023 10-K. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Aggarwal breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

142.    Additional reasons that demand on Defendant Bir is futile follow. Defendant Bir has served as a Company director since March 2019. She currently serves as the interim president and CEO, replacing Defendant Scarlett. The Company provides Defendant Bir with her principal occupation for which she receives lucrative compensation. Defendant Bir also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Scarlett, McDonald, and Spiegel to the Board for a three-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. She also signed the false and misleading 2023 10-K. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Bir breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

143.    Additional reasons that demand on Defendant O'Farrell is futile follow. Defendant O'Farrell has served as a Company director since March 2019 and is currently the Lead Independent Director. She also serves as the chair and financial expert of the Audit Committee, as a member of the Strategic Committee, and as the chairperson of the

board (replacing Defendant Scarlett). Defendant O'Farrell has received and continues to receive handsome compensation for her role as a director. Defendant O'Farrell also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Scarlett, McDonald, and Spiegel to the Board for a three-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. She also signed the false and misleading 2023 10-K. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.  For these reasons too, Defendant O'Farrell breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

144.    Additional reasons that demand on Defendant Lawlis is futile follow. Defendant Lawlis has served as a Company director since March 2012. He also serves as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Lawlis has received and continues to receive handsome compensation for his role as a director. Defendant Lawlis also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Scarlett, McDonald, and Spiegel to the Board for a three-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. He also signed the false and misleading 2023 10-K. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Lawlis breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

145.    Additional reasons that demand on Defendant Molineaux is futile follow. Defendant Molineaux has served as a Company director since September 2012. She also serves as the chair of the Nominating and Corporate Governance Committee. Defendant Molineaux has received and continues to receive handsome compensation for her role as a director. Defendant Molineaux also solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Scarlett, McDonald, and Spiegel to the Board for a three-year term, thereby allowing them to continue breaching their fiduciary duties to the Company. She also signed the false and misleading 2023 10-K. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Molineaux breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

146.    Additional reasons that demand on the Board is futile follow.

147.    Defendants O'Farrell (as Chair), McDonald, and Lawlis (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code

of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

148.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

149.    Geron has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Geron any part of the damages Geron suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

150.    The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

151.    The acts complained of herein constitute violations of fiduciary duties owed by Geron's officers and directors, and these acts are incapable of ratification.

152.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Geron. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Geron, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

153.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Geron to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

154.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## <u>FIRST CLAIM</u>
**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

155.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

156.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

157.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

158.   Defendants Scarlett, McDonald, Spiegel, Aggarwal, Bir, O'Farrell, Lawlis, and Molineaux caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the launch of RYTELO would be hindered by the weekly monitoring requirement, existing competition and seasonality, and a general lack of awareness in the health care industry of the treatment; (2) as a result of this, the launch of RYTELO would be less profitable than advertised; and (3) as a result of the foregoing, the Company would experience less growth than was advertised. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

159.   Under the direction and watch of Defendants Scarlett, McDonald, Spiegel, Aggarwal, Bir, O'Farrell, Lawlis, and Molineaux, the 2024 Proxy Statement also failed to disclose, *inter alia*, that: (1) though the Company claimed its officers and directors adhered

to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's description of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

160.   In the exercise of reasonable care, the Individual Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including, but not limited to, the reelection of the Company's directors.

161.   As a result of Defendants Scarlett, McDonald, Spiegel, Aggarwal, Bir, O'Farrell, Lawlis, and Molineaux causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants McDonald, Scarlett, and Spiegel to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve named executive officer compensation on advisory basis; and (3) ratify the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for 2024.

162.   The Company was damaged as a result of Defendants Scarlett's, McDonald's, Spiegel's, Aggarwal's, Bir's, O'Farrell's, Lawlis's, and Molineaux's material misrepresentations and omissions in the 2024 Proxy Statement.

163.   Plaintiff, on behalf of Geron, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

164.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

165.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Geron's business and

affairs.

166.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

167.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Geron.

168.    In breach of their fiduciary duties owed to Geron, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the launch of RYTELO would be hindered by the weekly monitoring requirement, existing competition and seasonality, and a general lack of awareness in the health care industry of the treatment; (2) as a result of this, the launch of RYTELO would be less profitable than advertised; and (3) as a result of the foregoing, the Company would experience less growth than was advertised. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

169.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

170.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

171.    In yet further breach of their fiduciary duties, during the Relevant Period, while shares of the Company's common stock were at artificially inflated prices before the fraud was exposed, three of the Individual Defendants engaged in lucrative insider sales, netting combined total proceeds of approximately $6.37 million.

172.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Geron's securities.

173.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Geron's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

174.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

175.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Geron has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

176.   Plaintiff, on behalf of Geron, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Unjust Enrichment

177.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

178.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Geron.

179.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Geron that was tied to the performance or artificially inflated valuation of Geron, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

180.   Plaintiff, as a shareholder and a representative of Geron, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

181.   Plaintiff, on behalf of Geron, has no adequate remedy at law.

### FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

182.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

183.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Geron, for which they are legally responsible.

184.   As a direct and proximate result of the Individual Defendants' abuse of control, Geron has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

185.   Plaintiff, on behalf of Geron, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

186.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

187.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Geron in a manner consistent with the operations of a publicly held corporation.

188.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Geron has sustained and will continue to sustain significant damages.

189.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

190.   Plaintiff, on behalf of Geron, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

191.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

192.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

193.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Geron to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and

its products.

194.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

195.    Plaintiff, on behalf of Geron, has no adequate remedy at law.

## SEVENTH CLAIM

**Against Defendants Scarlett, Grethlein, Robertson, Feller, Kapur, and Ziegler for Contribution Under Sections 10(b) and 21D of the Exchange Act**

196.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

197.    Geron and Defendants Scarlett, Grethlein, Robertson, Feller, Kapur, and Ziegler are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Scarlett's, Defendant Grethlein's, Defendant Robertson's, Defendant Feller's, Defendant Kapur's, and Defendant Ziegler's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

198.    Defendants Scarlett, Grethlein, Robertson, Feller, Kapur, and Ziegler, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Actions.

199.    Accordingly, Defendants Scarlett, Grethlein, Robertson, Feller, Kapur, and Ziegler are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

200.   As such, Geron is entitled to receive all appropriate contribution or indemnification from Defendants Scarlett, Grethlein, Robertson, Feller, Kapur, and Ziegler.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Geron, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Geron;

(c)   Determining and awarding to Geron the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing Geron and the Individual Defendants to take all necessary actions to reform and improve Geron's corporate governance and internal procedures to comply with applicable laws and to protect Geron and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.   a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.   a provision to permit the shareholders of Geron to nominate at least four candidates for election to the Board;

3.   a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

1
2
        (e)    Awarding Geron restitution from Individual Defendants, and each of them;

3
4
        (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

5
6
        (g)    Granting such other and further relief as the Court may deem just and proper.

7
## JURY TRIAL DEMANDED

8
9
Plaintiff hereby demands a trial by jury.

10
11
Dated: April 16, 2025               Respectfully submitted,

12
                                **THE BROWN LAW FIRM, P.C.**

13
14
                                */s/*Robert C. Moest         .
                                Robert C. Moest, Of Counsel, SBN 62166

15
                                2530 Wilshire Boulevard, Second Floor
                                Santa Monica, CA 90403

16
                                Telephone: (310) 915-6628

17
                                Facsimile: (310) 915-9897
                                Email: RMoest@aol.com

18
19
                                **THE BROWN LAW FIRM, P.C.**
                                Timothy Brown

20
                                767 Third Avenue, Suite 2501

21
                                New York, NY 10017
                                Telephone: (516) 922-5427

22
                                Facsimile: (516) 344-6204

23
                                Email: tbrown@thebrownlawfirm.net

24
                                *Attorneys for Plaintiff*

25
26
27
28

Verified Shareholder Derivative Complaint

## **VERIFICATION**

      I, Chad Lerner, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

      I declare under penalty of perjury that the foregoing is true and correct.  Executed this 15__ day of April, 2025.



Chad Lerner